## Roland H. Horner
### *v.*
## Charles J. Reuter.

*Filed at Mt. Vernon June 19, 1894.*

1. Limitations—*what acts constitute possession.* Where a person enters upon a tract of timber land, claiming to own it, and cuts wood for fuel and makes posts and rails upon it, such acts may constitute possession of the land, although it is not fenced or a house erected upon it.

2. Same—*twenty years sufficient without deed.* Possession under claim of ownership held for twenty years is sufficient to complete the bar, and it is not essential that the entry should be made under a deed or muniment of title.

Appeal from the Circuit Court of St. Clair county; the Hon. A. S. Wilderman, Judge, presiding.

Mr. William Winkelman, and Mr. James A. Lynn, for the appellant.

Messrs. Hamill & Borders, for the appellee.

Mr. Justice Craig delivered the opinion of the court:

This was an action of ejectment, brought by Roland H. Horner, in the circuit court of St. Clair county, against Charles J. Reuter, on the 25th day of March, 1893, to recover possession of a tract of land situated in the county of St. Clair, and described as follows : A part of the north-east quarter of section 13, township 2, north, range 7, west, beginning the survey at a post 5.07 chains north of the stone in the south-west corner of said north-east quarter, or center corner, of section 13, thence east 16.12 chains to the center of Silver creek, thence north 91 links to stake, thence west 16.12 chains to a stake, thence south 91 links to the place of beginning, containing one and 45-100 acres. On a trial of the cause the jury found in favor of the defendant, and the court, after overruling a motion for a new trial, rendered judgment on the verdict, to reverse which the plaintiff appealed.

The plaintiff claims title to a ten-acre tract of land under deed dated April 8, 1879, from Martin Wiley and wife to himself, described in the deed as follows : A part of the north-east quarter of section 13, in township 2, north of range 7, west of the third principal meridian, commencing at the south-west corner of said quarter of said section 13, thence running north about six chains, thence east to the center of Silver creek, thence south through the center of said creek to the south boundary of said quarter section, thence west to the place of beginning, containing ten acres, more or less, situated in the county of St. Clair and State of Illinois.

The defendant claims that Philip Schildknecht obtained title by deed from Johnson G. Ewing, on May 8, 1857, to the following described land, twenty and one-half acres, in St. Clair county : Being a part of the north-east quarter of section 13, township 2, north, range 7, west, and known as being all of said quarter that lies west of Silver creek, except ten acres that is taken off the south end by purchase made by Samuel Stites from A. W. Casad, as per reference to deed from said Casad to Stites will more fully set forth ; that in the year 1878 the title of Schildknecht passed to Christian Raum, and in 1881 Raum conveyed to defendant. This tract joins the ten-acre tract claimed by the plaintiff on the north, and plaintiff claims that the fence along the line of the two tracts stands over on his land, so that the defendant has in his possession one and 45-100 acres of land belonging to plaintiff. On the other hand, it is insisted by the defendant that he and his grantors have been in the actual adverse possession of the land in controversy, claiming to own the same, for a period of over twenty years before the action was brought, and that plaintiff's action is barred by the Statute of Limitations.

The plaintiff did not, on the trial, establish title to the ten-acre tract, or to any land in the quarter section, by a chain of conveyances from the government to him-

self ; but conceding that the deed from John L. Smith and wife to Martin Wiley, and the deed from Wiley to plaintiff, in connection with the payment of taxes and possession, were sufficient to establish title, *prima facie*, in the plaintiff to the ten-acre tract, the question presented by the record is, whether, under the evidence introduced on the trial, plaintiff's title to the tract in controversy is barred by the Statute of Limitations.

It appears from the evidence that in 1868 or 1869 Paris and Collier purchased from Martin Wiley what is known as the ten-acre tract. At that time the land was covered with timber and no improvements had been made upon it. Paris testified that he and Collier entered into possession in November, 1868, and took a bond for a deed ; that they employed surveyor Deneen to survey the land, and the surveyor reported that the tract contained eight and 7-100 acres. Paris also testified that he was with the surveyor when the survey was made ; that in running the north line he blazed the trees as directed by the surveyor, running east and west to the creek. He also testified that in 1871 or 1872 a fence was built along the blazed line, which remained there twenty-one or twenty-two years, on what was supposed to be the line between the two tracts of land. Afterwards a wire fence was erected along the same line, which still remains. In 1869 Paris sold out his interest to Collier, and five or six years later, Collier not being able to pay the purchase money, the land went back to Wiley. As has been seen, Schildknecht purchased the twenty-acre tract adjoining the ten-acre tract on the north, in 1857, and, as appears from the evidence, as early as 1860 he commenced using the land by cutting timber, and he continued to use it as a timber lot for wood, posts and rails, until 1871, when he commenced clearing the land.

A large number of witnesses were examined who have known the two tracts of land, and the manner in which

they were occupied, for thirty or forty years, but it will only be necessary to refer to the testimony of a few of the witnesses to show how the land in dispute has been occupied for the past twenty or thirty years before the action was brought.

Philip Weinacht testified: "I lived two miles northwest of Lebanon for thirty-two years. I am a farmer. I have known this land that lies immediately north of the Horner tract of land for thirty-one years. I know where the fence stood. I think that fence was built there about 1869. I remember seeing it that far back. Philip Schildknecht owned that land on the north side at that time. I saw him working up to that fence on the north side, chopping wood, making rails, and just anything, pretty near every winter from 1863–1864 along. I guess I saw him cutting close to the fence every winter from 1862 on. I saw him cutting on the line where the fence stood in 1860, and all through the sixties." He also testified that he knew the fence as the line between the two tracts since 1869 or 1870; "that fence has been recognized by the owners of the land on both sides as the line since about 1869,—may be a year before or later. The wire fence is pretty well on the line of the old rail fence. I know four years ago the fence row was there yet. The rails were pretty near all rotted down. The men on the north side cultivated up to the fence on the north side, and those working on the south side worked up to the fence on the south."

Henry Hecklinger testified: "I have known the land that was formerly owned by Schildknecht, and adjoining some land owned by Horner, north of Lebanon, since 1869 or 1870. Schildknecht was cutting wood on that land. He cleared about an acre and a half or two acres there, from the line. In 1872 that was all cleared. I helped clearing. I was working for Schildknecht. I know where that fence was. We started clearing right at the fence and went north, in 1871. I was cutting

there two winters, clearing there that two acres off, and then we cut further up north. We hauled the timber home for rails and fire-wood. Schildknecht had some other parties hired there too to chop cord-wood. We cleared all along that fence from the west end of that land towards the Silver creek on the east. Schildknecht owned the land at that time. He died in July, 1873. I know he claimed to own that land on the north side up to that fence as long as he lived. After his death his widow owned the land. She made the same claim of owning it up to this fence. Schildknecht always said he was claiming it, up to the time of his death. After his death Mrs. Schildknecht had it quite a while. She had it and leased it out, and then afterwards she sold to Raum, I believe in 1877 or 1878,—I could not say just now. She owned it up to the time she sold it to Raum. The land was in her possession all the time until she sold it. She was claiming to be the owner. When she sold it to Raum that was the line all the time. He went into possession up to that line and was claiming to be the owner up to that fence. He farmed it up to that line."

The testimony also shows that after Raum purchased he cultivated the land until 1881, when he sold and transferred his possession to the defendant, who has been in the actual possession ever since.

We think it is apparent from the evidence that Schildknecht went into the possession of the land as early as 1860. From that time up to 1869 or 1870 he used it as a wood lot, in connection with a farm where he resided. He cut wood, made posts and rails, and hauled them to his farm. Where a person enters upon a tract of timber land, claiming to own it, cuts wood for fuel, makes posts and rails to be used on a farm, such acts may constitute possession of the land, although it is not fenced or a house erected upon it.

But, disregarding all the acts of Schildknecht prior to 1870, there is still ample evidence to sustain the ver-

dict of the jury. As has been seen, in 1870 or 1871 the line between the two tracts was surveyed and the trees were blazed to show where the line was located. A fence was built on that line, and, as the evidence shows, Schildknecht entered upon the land under a claim of ownership and cleared an acre and one-half along the line of the fence,—the land in controversy. He remained in possession until his death, in 1873. Upon his death his widow came into possession, claiming to be the owner up to the fence, and exercised acts of ownership as her husband had done. She leased the land, and her tenant took possession, built a house and cultivated the land. In 1877 or 1878 she sold out to Raum, and transferred the possession to him. He held as owner until 1881, when he sold to appellee and transferred the possession to him, and he has held the possession as owner ever since. Here was a period of over twenty years of actual adverse possession by appellee and his grantors, which, under the statute, is a bar to a recovery. As was said in *Hubbard* v. *Stearns*, 86 Ill. 35: "As has been held in *Turney* v. *Chamberlain*, 15 Ill. 273, and subsequent cases, it is not essential, under the statute, that the party who takes possession and holds adversely should enter under a deed or muniment of title. Possession under a claim of ownership, taken and held for a period of twenty years, is sufficient to complete the bar. *Weber* v. *Anderson*, 73 Ill. 439."

In *Flaherty* v. *McCormick*, 113 Ill. 538, where possession was taken without paper title, claiming adversely to the party who held paper title, for a period of twenty years, it was said : "We are aware of the fact that it has been held by some courts of last resort that possession of lands, to be availing, must be taken and held under color of title ; but such is not the rule which has been established in this State. This court has held in a number of cases that actual occupation of a tract of land for a period of twenty years, under claim of ownership, is suf-

ficient to bar an action brought by the party holding the title, where the owner of the title is not under disability. *Weber* v. *Anderson,* 73 Ill. 440; *Hubbard* v. *Stearns,* 86 id. 35; *Schneider* v. *Botsch,* 90 id. 577; *James* v. *Indianapolis and St. Louis Railroad Co.* 91 id. 554."

It is, however, claimed in the argument that from the death of Schildknecht, in 1873, until the lease was made by the widow to Wheeler in 1876, the evidence fails to show that the possession of the land was held by her. Weinacht, who married the widow, testified that after the death of Schildknecht she claimed the land to the line fence, as her husband did. Upon being asked how long the widow had the land, the witness said: "She had it quite a while; she had it and leased it out, and then afterwards she sold it to Mr. Raum,—I believe in 1877 or 1878." "Did she own it up to the time she sold to Mr. Raum?" "Yes, sir." "The land was in her possession all the time until she sold it?" "Yes, sir." "She claimed to be the owner?" "Yes, sir."

In the absence of any evidence whatever that any other person was in the possession of the land from 1873 to 1876, we regard the evidence to establish the possession of the widow ample to sustain the verdict. Upon the death of Schildknecht, whatever interest he had in the land, including his possession, would descend to his widow and heirs, and the possession would remain in them until it was abandoned or until they were dispossessed by process of law. The possession was never abandoned, nor was any action brought to recover it, but, on the other hand, the widow held it until 1876, when she leased to Wheeler for three years, and he cultivated the land until it was transferred by the widow to Raum.

The jury found that the possession of the land was held adversely to the plaintiff for more than twenty years, and we are of opinion the evidence sustains the finding.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*